STATE of Iowa, Appellee,

v.

Bradley James COMRIED, Appellant.

No. 03–1166.

Supreme Court of Iowa.

March 18, 2005.

Linda Del Gallo, State Appellate Defender, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, and Timothy W. Dille, County Attorney, for appellee.

LARSON, Justice.

James Comried was convicted of vehicular homicide while having a controlled substance in his blood, in violation of Iowa Code section 707.6A(1) (2001). He contends the district court misapplied this Code section and that his conviction is unsupported by substantial evidence. We disagree on both points and therefore affirm his conviction.

## I. *Facts and Prior Proceedings.*

Comried, in attempting to outrun a police car, ran into a vehicle driven by Donald Rotenburger, who died as a result of the collision. Pursuant to a search warrant, the officers obtained a blood sample that, together with a urine sample voluntarily provided by Comried, was sent to the state's criminalistics laboratory for analysis. *See* Iowa Admin. Code r. 661–7.4 (2003). This laboratory performs two types of tests: an initial screening test and a confirmatory test. The initial test is performed at certain "cutoff levels," meaning that only drug concentrations over the cutoff level will yield a "positive" test result. Any concentration below the cutoff level is reported "negative." *See* Iowa Admin. Code r. 661—7.9 (providing cutoff levels for initial screening tests of urine). If the initial screening test shows positive, a second test is performed on the sample. This second test, the confirmatory test, is presumably more expensive but is also more reliable and produces very accurate results.[1]

This case is somewhat unique because it involves samples of both blood and urine. When the lab performed the initial screening tests, Comried's blood sample tested negative, but his urine sample tested positive for amphetamine and methamphetamine. Both samples were subjected to confirmatory testing, and both tested positive for methamphetamine.

Comried was charged with vehicular homicide while intoxicated in violation of Iowa Code section 707.6A(1), which states: "A person commits a class 'B' felony when the person unintentionally causes the death of another by operating a motor vehicle while intoxicated, as prohibited by section 321J.2." Section 321J.2 states:

1. A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state in any of the following conditions:

*a.* While under the influence of an alcoholic beverage or other drug or a combination of such substances.

*b.* While having an alcohol concentration of .10 or more.

*c.* While *any amount* of a controlled substance is present in the person, as measured in the person's blood or urine.

(Emphasis added). The State charged that, because Comried had "any amount" (80 ng/ml) of methamphetamine in his blood at the time of the accident, he violated section 321J.2(1)(*c*), and because of Rotenburger's death, he violated section 707.6A(1) as well.

Before trial, Comried moved for an adjudication of law points, arguing that the "any amount" language of section 321J.2(1)(*c*) impliedly incorporated a Department of Public Safety (DPS) rule setting cutoff levels for concentration of a

---

1. *See* Dep't of Public Safety, Div. of Criminal Investigation, Criminalistics Laboratory, *Toxicology,* *at* http://www.state.ia.us/govern-ment/dps/dci/lab/toxicology.htm (last accessed Feb. 11, 2005).

drug. According to him, "any amount" means any amount above the cutoff level. The State countered that "any amount" means what it says—if a test detects any amount of a controlled substance, the any-amount element is satisfied. Judge Morrison agreed with the State, holding that " '[a]ny' means any." Judge Wilson, in a jury-waived trial, found Comried guilty.

## II. *Application of the Statute.*

A. *Principles of construction.* We recently summarized the principles of statutory construction:

> When we interpret a statute, we attempt to give effect to the general assembly's intent in enacting the law. Generally, this intent is gleaned from the language of the statute. To ascertain the meaning of the statutory language, we consider the context of the provision at issue and strive to interpret it in a manner consistent with the statute as an integrated whole. Similarly, we interpret a statute consistently with other statutes concerning the same or a related subject. Finally, statutes are interpreted in a manner to avoid absurd results and to avoid rendering any part of the enactment superfluous.

*State v. Pickett,* 671 N.W.2d 866, 870 (Iowa 2003) (citations and internal quotations omitted). Also,

> [i]n construing a statute denouncing the offense of driving while under the influence of intoxicants, the manifest purpose of the statute may not be ignored. Although such a statute is a penal statute and must be strictly construed, such a statute, since it is designed to protect the public, should be liberally or reasonably construed in order to effect its purpose to protect, as far as may be, every person lawfully on the highway, and to reduce the hazard of prohibited operation of a motor vehicle to a minimum.

61A C.J.S. *Motor Vehicles* § 1385, at 274 (2002) (footnotes omitted).

■ B. *The statute's text.* Section 321J.2(1) lists three separate offenses. The first criminalizes driving while under the *influence* of alcohol or drugs. Iowa Code § 321J.2(1)(*a*). The next two subsections delineate specific concentrations of those substances that automatically trigger a violation. *Id.* § 321J.2(1)(*b*), (*c*). Under these subsections, the State need not prove the defendant was under the influence—only that he was driving a motor vehicle with a specific amount of alcohol or drugs in his body. In 2002 the specific amount for alcohol was a blood-alcohol concentration of .10 or more. *Id.* § 321J.2(1)(*b*).[2] As to controlled substances, "any amount" violates the statute. *Id.* § 321J.2(1)(*c*).

C. *The statute's purpose.* We have said the purpose of chapter 321J is " 'to reduce the holocaust on our highways[,] part of which is due to the driver who imbibes too freely of intoxicating liquor.' " *State v. Kelly,* 430 N.W.2d 427, 429 (Iowa 1988) (quoting *State v. Hitchens,* 294 N.W.2d 686, 687 (Iowa 1980)). At the time *Kelly* was decided, there were only two ways a person could violate the statute. The first was if the person was under the influence of alcohol or drugs; the second was if he had a blood-alcohol content of more than .10. *See* Iowa Code § 321J.2(1) (1987).

In 1998, however, that changed. The legislature added subsection (1)(*c*), prohibiting driving with any amount of a controlled substance in the body. 1998 Iowa

---

**2.** The legislature has since lowered the requisite blood-alcohol concentration. The limit is now .08. *See* 2003 Iowa Acts ch. 60, § 1.

Acts ch. 1138, § 11. Although there is no direct legislative history, the legislature likely included the "any amount" language in the amendment to create a per se ban. Subsection (1)(a) already prohibited driving while under the influence of drugs. Thus, subsection (1)(c) was intended to do something more—to prohibit people from operating motor vehicles with controlled substances in their bodies, whether or not they are under the influence.

The legislature could reasonably have imposed such a ban because the effects of drugs, as contrasted to the effects of alcohol, can vary greatly among those who use them. One court has observed that,

> since the manufacture and distribution of illicit drugs are unregulated and because the drugs' potency varies, the effects are unpredictable. Therefore, ... there is no level of use above which people can be presumed impaired or below which they can be presumed unimpaired.

*State v. Phillips*, 178 Ariz. 368, 873 P.2d 706, 708 (Ct.App.1994); *accord Shepler v. State*, 758 N.E.2d 966, 969–70 (Ind.Ct.App. 2001) ("[T]here is no accepted agreement as to the quantity of a controlled substance needed to cause impairment. We therefore agree with the State that it was reasonable for the legislature to differentiate between alcohol and controlled substances and to prohibit driving with any controlled substance in the body."). Our court of appeals has reached a similar conclusion in a license-revocation case based on driving with controlled substances in the body. The court, noting the difficulty in relating the amount of drugs in the body to driving impairment, said:

> Unlike the blood alcohol concentration test used to measure alcohol impairment there is no similar test to measure marijuana impairment. There is, though, as was used here, a test to measure the use

of marijuana, a drug illegal in the State of Iowa, in a person's body. There being no reliable indicator of impairment, the legislature could rationally decide that the public is best protected by prohibiting one from driving who has a measurable amount of marijuana metabolites.

*Loder v. Iowa Dep't of Transp.*, 622 N.W.2d 513, 516 (Iowa Ct.App.2000) (footnote omitted).

### III. *The Screening Regulation.*

Comried argues that the above statutory analysis is altered by Iowa Administrative Code rule 661—7.9, a recently promulgated DPS regulation. He contends that this regulation—which, as explained below, sets cutoff levels for initial screening tests for drugs in urine samples—modifies the definition of "any" in Iowa Code section 321J.2(1)(c). We do not agree.

The DPS regulation relied on by Comried was promulgated under Iowa Code section 321J.2(8)(c), which states:

> The department of public safety shall adopt nationally accepted standards for determining detectible levels of controlled substances in the division of criminal investigation's *initial laboratory screening test* for controlled substances.

(Emphasis added.) This statute limits the DPS's power to set cutoff levels: they are to apply only to "initial laboratory screening tests," not to confirmatory tests. As directed, the DPS adopted this rule:

> [Federal initial test requirements] are hereby adopted as standards for determining detectable levels of controlled substances in the division of criminal investigation criminalistics laboratory *initial screening* for controlled substances....

Iowa Admin. Code r. 661—7.9 (emphasis added).

■ This screening rule is limited in another way: it does not apply to blood samples. This is apparent from reading the federal regulations to which the DPS regulation refers. *See* Mandatory Guidelines for Federal Workplace Drug Testing Programs, 59 Fed.Reg. 29908 (June 9, 1994); *see also* Revisions to the Mandatory Guidelines, 62 Fed.Reg. 51118 (Sept. 30, 1997). Both of these federal regulations appear to be limited to urine testing. *See* 59 Fed.Reg. at 29921, § 2.4(e)(1) (describing the initial screening tests and setting cutoff levels to use when screening "specimens"); *see also id.* at 29917 (defining "specimen" as "[t]he portion of *urine* that is collected from a donor" (emphasis added)). It appears that the DPS, by referring to the federal regulations, only intended its regulation's cutoff levels to apply to initial testing of urine. In Comried's case, the test confirming the presence of methamphetamine was not an initial screening, but a confirmatory test. In addition, the test was of a blood sample, not urine, as dealt with in the DPS regulation.

Comried contends that cutoff levels for blood tests should incorporate those for urine tests, but the two types of tests and their probative value are significantly different. Urine tests for drugs are relatively simple to conduct, and they do not require involvement of medical personnel. Blood tests, however, are more accurate and provide the best indication of driving impairment. One court has observed that, according to expert testimony,

> metabolites of a drug are a product of the body's metabolizing, or breaking down, the original drug into discrete components. It is only when the drug is in the bloodstream that it is capable of impairment of driving skills, and this impairment lasts only so long as the drug is in the bloodstream. At the metabolite stage, the metabolic component detected in the urine is "inactive," in the sense that it is incapable of causing impairment. Many drugs will continue to appear in the urine in metabolite form for days or even weeks after use. A urine test, while indicative of what has been in the bloodstream in the past, says nothing conclusive about what is presently in the bloodstream.

*State v. Hammonds,* 192 Ariz. 528, 968 P.2d 601, 603 (Ct.App.1998); *accord Rodriguez v. Fulton,* 190 N.W.2d 417, 418 (Iowa 1971) (stating that blood tests are "generally considered more reliable than the other tests").

### IV. *The Margin–of–Error and Legal–Drug Arguments.*

■ A. *The margin-of-error argument.* The parties signed a stipulation of facts that included a confirmatory laboratory report showing that Comried's blood contained 80 ng/ml of methamphetamine. This stipulation was not modified in any way by the claim Comried now asserts— that perhaps a margin of error had not first been deducted from the test. *See* Iowa Code § 321J.2(10) (requiring deduction for margin of error). If Comried had raised this issue at trial, the State would have had an opportunity to present evidence as to whether the lab complied with this statutory requirement. All we have before us, and all the district court had before it, is a laboratory report that shows the presence of methamphetamine. The defendant did not raise any argument based on section 321J.2(10) in his motion to adjudicate law points or at the hearing on it. Any objection to the validity of the laboratory report based on section 321J.2(10) has been waived.

■ B. *The legal-drug argument.* Comried also contends it is necessary to

establish an arbitrary cutoff to reduce the chance of being convicted for driving with legal drugs in his system. Comried did not raise this argument in his motion to adjudicate law points or in the stipulation of facts. In any event, it is not necessary for us to read into the statute an arbitrary cutoff test to ameliorate the consequences of legal drug ingestion because the legislature has already dealt with that contingency. Iowa Code section 321J.2(7)(*b*) states:

> When charged with a violation of subsection 1, paragraph "*c*", a person may assert, as an affirmative defense, that the controlled substance present in the person's blood or urine was prescribed or dispensed for the person and was taken in accordance with the directions of a practitioner and the labeling directions of the pharmacy, as that person and place of business are defined in section 155A.3.

Comried did not assert an affirmative defense on this basis.

We conclude that the statute in question is clear and unambiguous and that "any amount" means any amount greater than zero. Other courts have reached this conclusion as well. *See, e.g., Hammonds,* 968 P.2d at 604 (flat ban on driving with a controlled substance in the body upheld); *Kevinezz v. State,* 265 Ga. 78, 454 S.E.2d 441, 442 (1995) ("As 'any amount' necessarily means any amount greater than zero, we hold that [the statute] provides adequate notice that a person who ingests marijuana or any other drug specified in [the statute] and then drives a motor vehicle does so at his or her own peril . . . ."); *Bennett v. State,* 801 N.E.2d 170, 176 (Ind. Ct.App.2003) (flat-ban statute upheld on basis "it is rational for the legislature to impose the flat ban with regard to controlled substances while not imposing the same ban with regard to alcohol").

In analogous cases, statutory provisions against *possession* of "any amount" of drugs have been interpreted similarly. *See State v. Maghee,* 573 N.W.2d 1, 11–13 (Iowa 1998) (the "any amount" statute is violated by proof of defendant's possession of a "detectable" amount of cocaine); *see also State v. Fletcher,* 221 Neb. 562, 378 N.W.2d 859, 862–63 (1985) (reaffirming that statute prohibiting possession of drugs in "any quantity" banned possession of *any* identifiable amount); *State v. Wood,* 117 N.M. 682, 875 P.2d 1113, 1115–16 (Ct.App.1994) ("any amount" satisfied by showing any identifiable amount of drugs); *State v. Henry,* 116 Or.App. 138, 840 P.2d 1335, 1336 (Ct.App.1992) (possession-of-drug statute violated by possessing "even a trace" of methamphetamine).

We agree with the district court that Comried operated a motor vehicle in violation of Iowa Code section 321J.2(1)(*c*), and because it caused a death, he is guilty of violating section 707.6A(1) as well.

## V. *Sufficiency of the Evidence.*

Comried argues that the evidence was insufficient to support his conviction, based on his argument that the blood test results should not have been admitted. He concedes on appeal, however, that "[this] argument is premised upon this court accepting the argument [that the blood test must be subjected to a cutoff level]." We have rejected that argument, and we therefore reject his sufficiency-of-the-evidence argument as well.

**AFFIRMED.**