APPEL, Justice
(dissenting).
I would dismiss this petition for further review as improvidently granted. I agree with Justice Hecht that the only question preserved in the district court was its constitutional holding, the only issue raised on appeal is a statutory claim, and as a result, neither is appropriate for our review. Further, the briefing on the statutory claim on appeal and in the district court was minimal. Erik Childs simply argues that our existing precedent, State v. Comried, 693 N.W.2d 773 (Iowa 2005), was wrongly decided because it relied on an Arizona case, State v. Phillips, 178 Ariz. 368, 873 P.2d 706 (App. 1994), which was subsequently distinguished in State ex rel. Montgomery v. Harris, 234 Ariz. 343, 322 P.3d 160, 164 (2014). That is the extent of the argument actually presented. This case is thus not a good vehicle for deciding some of the very important questions posed by Iowa Code section 321J.2 (2014). But the majority is determined to proceed to make its sweeping declarations about the statute. I find the case far more troubling than does the majority.
Iowa enacted the relevant provision of the present statute in 1998.1998 Iowa Acts ch. 1138, § 11 (codified at Iowa Code § 321J.2(1) (1999)). In Comried, we considered a vehicular homicide conviction under Iowa Code section 707.6A(1) (2001). Comried, 693 N.W.2d at 774. That conviction was based on a violation of section 321J.2, which provided that a person with any amount of a controlled substance in the body was guilty of intoxicated driving. Id. We held that “any” means “any.” Id. at 778. No constitutional issues were raised in Comried. See id. at 775-78. Childs invites us to reconsider the result in Comried. He *197 relies in large part on developments in Arizona law, where an appellate court in Harris recently held that a similar statute should be narrowly construed to avoid absurd results. 322 P.3d at 164.
I start with the basic question—what is the purpose of the statute? That one is easy. We have said the purpose of the statute is to “promote public safety by removing dangerous drivers from the highways.” Bearinger v. Iowa Dep’t of Transp., 844 N.W.2d 104, 107 (Iowa 2014) (quoting State v. Vogel, 548 N.W.2d 584, 587 (Iowa 1996)). We have never found that a purpose of the statute was to stigmatize marijuana use or impose penalties on marijuana users because of their status.
The next question is whether the statute, if interpreted literally, fits the legislative purpose of addressing the danger of impaired drivers on the road. Here, we hit tougher terrain. The per se approach, which declares that the presence of any metabolite, active or inactive, is sufficient to support a criminal conviction and potential imprisonment, is clearly overbroad in light of the purpose' of the statute. The science is clear that the inactive metabolites of marijuana may remain in the body for weeks after consumption. See Nat’l Highway Traffic & Safety Admin., Drugs and Human Performance Fact Sheets, Cannabis/Marijuana, https://one.nhtsa. gov/people/injury/research/jobl85drugs/ eannabis.htm (last visited June 22, 2017) (stating detection time for THC metabolites in urine is well past the window of intoxication and impairment). Thus, many persons are subject to the statute even though their driving is not impaired in the least and their marijuana use was not recent. Assuming we behave rationally, we do not impose criminal penalties arising from behavior due to its danger when, in fact, the behavior is not dangérous.
The statute thus raises serious constitutional problems. I doubt that it is consistent with due process to subject a person to potential incarceration under 'a criminal law designed to prevent dangerous behavior when the behavior itself is not dangerous at all. It would be outrageous, in my view, to impose harsh sanctions on a driver who was exposed to marijuana weeks or months ago and poses no danger on the road, all in the name of highway safety. As noted by Justice Cavanagh in People v. Derror, “There is no rational reason to charge a person who inhaled. marijuana two weeks ago and who now decides to drive to the store to pick up a gallon of milk.” 475 Mich. 316, 715 N.W.2d 822, 846 (2006) (Cavanagh, J., dissenting), overruled by People v. Feezel, 486 Mich. 184, 783 N.W.2d 67, 86 (2010); see also Commonwealth v. Etchison, 916 A.2d 1169, 1174-78 (Pa. Super. Ct. 2007) (Bender, J., concurring in part and dissenting in part). These dissents emphasize that one cannot draw any reasonable conclusion of impairment solely from a positive test for canna-binoids. Derror, 715 N.W.2d at 846; Etchison, 916 A.2d at 1175; see also Feezel, 783 N.W.2d at 83, 86 (overruling the Derror majority and holding that a metabolite of THC is not a controlled substance under Michigan law). While it is true, of course, that no constitutional issues were raised in this appeal, we ordinarily interpret statutes to avoid constitutional problems. Simmons v. State Pub. Def., 791 N.W.2d 69, 73-74 (Iowa 2010).
Notably, we recently decided an important case which required that a defendant’s state of intoxication must be tied in a causal way to the injuries resulting in a case of homicide by vehicle. See State v. Adams, 810 N.W.2d 365, 371 (Iowa 2012). In Adams, the state argued that merely driving while intoxicated was sufficient to establish an offense under the statute. Id. at 368-69. We noted that criminal statutes *198 are strictly construed against the state and that we would not produce an absurd result. Id. at 369. We concluded that the intoxication of the driver must be causally linked to the underlying death. Id. at 372; see Eric A. Johnson, Wrongful-Aspect Overdetermination: The Scope-of-the-Risk Requirement in Drunk-Driving Homicide, 46 Conn. L. Rev. 601, 605-06 & nn. 17-18 (2013) (describing the split in the courts on the question of whether scope-of-risk doctrine from tort law applies in criminal law setting of intoxicated driving). Applying Actoms-type logic here, the presence of a metabolite and use of marijuana must be a cause of harm or a cause of a risk of harm to support a criminal conviction. This argument, of course, was not raised-in this appeal.
Another constitutional problem with the statute is that it does not provide a person of ordinary intelligence with fair notice. Metabolites from marijuana can., be retained in a person’s system for days or weeks. A person who has consumed marijuana thus has no fair notice as to when he or she may legally drive a car. It may be a day, weeks, months, or even years. Consistent with the observation made by Justice Cavanagh in Derror, .the Childs majority’s interpretation “now criminalizes a broad range of conduct and makes criminals out of people who have no knowledge of the conduct that they must now seek to avoid.” 715 N.W.2d at 844. Suppose, for instance, one travels to Colorado on vacation and lawfully smokes marijuana. May that person lawfully drive back to Iowa when returning home? How long must the person wait before lawfully driving? Can anybody know? A driver with the majority opinion in their glove compartment will not find any useful advice on this issue.
Further, it is well established that metabolites of marijuana can be obtained through passive inhalation. See id.; cf. Daniel P. Mazo, Comment, Yellow Rows of Test Tubes: Due Process Constraints on Discharges of Public Employees Based on Drug Urinalysis Testing, 135 U. Pa. L. Rev. 1623, 1647 (1987) (“Research indicates that urinalysis also cannot discern active smoking of marijuana and hashish from passive inhalation.... ”); Kaye McDonald Sunderland & Coni S. Rathbone, Jar Wars: Drug Testing in the Workplace, 23 Willamette L. Rev. 529, 548 (1987) (“[Pjassive inhalation' must be considered as a possible sou'rce when interpreting low level test results.”). Under the State’s interpretation, a driver who had a trace of metabolite, based upon passive transmission, is subject to serious criminal offenses. But there is “no rational reason to charge a person who passively inhaled marijuana smoke at a rock concert a month ago and who now decides to drive to work.” Derror, 715 N.W.2d at 846.
In order to avoid all these problems, it might be asserted that the statute does not criminalize dangerous driving, but criminalizes the. status of being a recent user of marijuana. I doubt the legislature would bury a status crime in its driving statutes. In any event, an effort to justify the penalties on. marijuana use as a status offense would also run into serious constitutional problems. If the legislature sought to punish marijuana users for their status as marijuana users, the classification in the statute distinguishing marijuana users who happen to be driving from those who are, for instance, passengers, would be subject to attack as an irrational classification in violation of equal protection principles. The status of drivers and nondrivers who have metabolites of.marijuana would be the same, yet they are treated differently under the statute.
We have already invoked the absurdity doctrine in the area of drunk driving to avoid unintended convictions not related to *199 the purpose of the statute of dealing with the danger of impaired drivers. In Bear-inger, we considered whether the prescription-drug defense applied to administrative actions involving the. revocation of drivers’ licenses. 844 N.W.2d at 105. Interestingly, the underlying criminal statute for OWI expressly contained such a defense, but the statute relating to revocations did not contain similar language. Id. at 107-08. Ordinarily, we would honor the legislative text. In Bearinger, however, we emphasized that the purpose of the statute was highway safety and that persons-who were driving while using prescription drugs as prescribed by a physician were not a danger and thus should not be subject to license revocation. Id. at 110.
In Bearinger, we did not rely on legislative text and call it a" day. Instead, we imported language into the legislative text to ensure that the purpose of the statute— namely, protecting the public against dangerous drivers—was advanced.-Why don’t we apply the same reasoning here and interpret the statute to mean an active metabolite? What accounts for the active and energetic approach in Bearinger to focus on actual public safety and the steadfast refusal to do so here? Is it a desire to express strong cultural disapproval of marijuana? If so, how is this rationally related to a statute designed to combat impaired drivers?
There is support in-the academic literature for a Bearinger/Ho/ms-type interpretation. The literature points out that the presence of minute amounts of a metabolite simply has no relationship with recent ingestion, let alone impaired driving. See Andrea Roth, The Uneasy Case for Marijuana as Chemical Impairment Under a Science-Based Jurisprudence of Dangerousness, 103 Cal. L. Rev. 841, 890 (2015) (“[A] prohibitionist approach is an awkward fit if the justification for- the law is the dangerousness of the drug’s impairing effects..'...”); Joshua C. Snow, The Unconstitutional Prosecution of Controlled Substance Metabolites Under Utah Code § 41-6A-517, 2013 Utah L. Rev. OnLaw 195, 203 (2013) (“[T]he presence of a metabolite in the body does not necessarily equate with present intoxication [and] does not even equate with recent ingestion.”).
" There is another policy-based rationale for giving the statute a narrow gloss. As Professor Steven Bender has observed, the history of marijuana legislation is based on racial stereotyping, and enforcement of open-ended marijuana laws leads to disproportionate enforcement against racial minorities. Steven W. Bender, The Colors of. Cannabis: Race and Marijuana, 50 U.C. Davis L. Rev. 689, 690 (2016). Bender traces the origin of strict marijuana legislation to “raeialized perceptions of users of color as threatening public safety and welfare.” Id. Bender notes the “disproportionate burden of marijuana enforcement on racial minorities.” Id. at 693. Racial minorities are subject to “Driving While Black” or “Driving While Hispanic.” Id. at 701-02; see also David A. Harris, “Driving While Black” and All Other Traffic Offenses:.The Supreme Court and Pretextual Traffic Stops, 87 J. Crim. L. & Criminology 544, 546 (1997). Thus, wittingly or not, inactive metabolite laws may be a contributing factor leading to disproportionate prison populations such as that experienced in Iowa. See generallyt Michelle Alexander, The New Jim Crow: Mass Incarceration in the Age of Colorblindness 59-96 (rev. ed. 2012).
The majority nonetheless concludes that the legislature intended to proceed with its sweeping regulation notwithstanding the problems cited above. The majority’s statutory approach requires persons with trace metabolites, but who pose no threat to public safety, to sacrifice personal free *200 dom for the benefit of the community because more precise measurement tools have not been developed. Such persons are the statute’s roadkill under the majority’s interpretation. The people picking up the gallon of milk weeks after smoking marijuana or after being passively exposed to marijuana are not culpable under the statute, but their convictions under the statute amount to unfortunate collateral damage imposed because the State is looking for a convenient way to obtain convictions without the traditional methods of proving impairment on a case-by-case basis through ordinary evidentiary techniques.
I am not so sure. I recognize the difficulties in interpreting the statute in light of the specific statutory text. But did the legislature in 1998 intend for this absurd result? I recognize the standard of absurdity is a high bar. See Brakke v. Iowa Dep’t of Nat. Res., 897 N.W.2d 522, 534 (Iowa 2017). But one wonders whether the legislature was fully aware of the evolving science and the implications of the statutory text. Certainly some of the statute’s applications are absurd. Does the statute in full context introduce enough ambiguity to avoid untoward results?
A case can be made, perhaps, for upholding Comried based upon legislative acquiescence or stare decisis. The case for legislative acquiescence and stare decisis was much stronger in State v. Williams, 895 N.W.2d 856 (Iowa 2017), where an interpretation of the meaning of the term “arrest” had been repeatedly endorsed in multiple opinions over a thirty-seven-year period, the most recent of which, State v. Wing, 791 N.W.2d 243 (Iowa 2010), overruled by Williams, 895 N.W.2d at 867-73, was thoroughly reasoned. The Comried decision, however, is cryptic, does not explore the troublesome contours of a per se interpretation, does not recognize the constitutional issues, and has not been repeated in thorough opinions. Further, as has been pointed out by Justice Hecht, the statutory language has been amended since Com-ried.
The notion that broadly framed statutes can be narrowly interpreted is not a new concept. In Iowa Insurance Institute v. Core Group of Iowa Association for Justice, we held that a statute, which on its face required disclosure of “all information ... concerning the employee’s physical or mental condition relative to the claim,” did not include information protected by the work-product doctrine. 867 N.W.2d 58, 69, 79 (Iowa 2015) (quoting Iowa Code § 85.27(2) (2011)). We held that the statute should not be evaluated solely based on isolated words. Id. at 72. Instead, we insisted on looking at the statute’s larger context. Id. As we noted, there are many occasions when we have narrowed the apparently unqualified isolated terms of a statute. Id. at 73-74.
That is the type of reasoning I would apply here. In looking at the totality of the statute, its structure, and its purposes, one begins to question whether the legislature intended to include inactive metabolites notwithstanding the unqualified but isolated language used in the statute. I would be inclined to cinch up the statute in some fashion to avoid the untoward results that I doubt the legislature intended, either by requiring the presence of an active metabolite as in Harris, 322 P.3d at 164, or by requiring a causal link as in Adams, 810 N.W.2d at 371.
In any event, the cheers and jeers that will no doubt arise from today’s decision may be premature. The approach taken today may eliminate a less intrusive statutory-interpretation solution to the obvious problems of the statute. But weighty constitutional problems remain. Can criminal sanctions arise from application of this drugged-driving statute to someone who, *201 in fact, poses no danger at all arising from consumption of marijuana, or maybe poppy seed rolls, in the past, the consumption of which demonstrably has no relationship to impaired driving? Where the inactive metabolite has no causal relationship to impaired driving, would any conviction be an impermissible status offense? Does the presence of a metabolite in any amount under the statute present an irrebuttable presumption contrary to due process? Does conviction of such persons under a jurisprudence of dangerousness serve any legitimate penal purpose under the Eighth Amendment or article I, section 18 of the Iowa Constitution? Would an enhanced criminal penalty under Iowa’s statute for repeat offenders be subject to a Bruegger-type challenge, where a very broad law involving a wide variation of conduct is combined with an escalating criminal sanction? See State v. Bruegger, 773 N.W.2d 862, 884 (Iowa 2009). Do due process and cruel-and-unusual-punishment concepts require the State to prove impaired driving on a case-by-case basis, like so many other crimes? If interpreted as a status crime, can the distinction between drivers and others who have recently ingested marijuana be defended from an equal protection challenge?
The statutory shoe has been dropped. The constitutional shoe will drop in future cases. The practical effect of today’s decision may well be to kick the can down the road and escalate future disputes to a constitutional dimension.
No one doubts, of course, the ability of the legislature to enact statutes that protect the public from drivers who are actually impaired. The question for the future is whether the legislature can establish a regime to control dangerous drivers that, in many applications, relies on a sweeping generality that is unsupported by science and does not utilize the traditional American way of requiring individualized guilt based on moral culpability before criminal sanctions are enforced.