968 P.2d 601

**STATE of Arizona, Appellee,**

**v.**

**Jack Ray HAMMONDS, Appellant.**

**No. 1 CA–CR 97–0420.**

Court of Appeals of Arizona,
Division 1, Department B.

April 28, 1998.

Review Denied Dec. 7, 1998.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Serena Christion, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Stephen R. Collins, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

SULT, Judge.

¶ 1    Jack Ray Hammonds appeals from his conviction and sentence on one count of aggravated driving while a drug or its metabolite was present in his body, a class 4 felony. The sole issue on appeal is whether the statute prohibiting driving while a metabolite of a drug is present in the driver's body violates the equal protection clauses of the federal and Arizona constitutions. For the reasons that follow, we affirm.

## BACKGROUND

¶ 2    In June 1995, Hammonds was stopped by Glendale police for driving a vehicle with an expired registration tag and a

fictitious license plate. The officer who initiated the stop observed open beer cans in the car, and Hammonds displayed symptoms of intoxication. Officers administered field sobriety tests and arrested Hammonds for DUI.

¶ 3    Hammonds was transported to the police station, where he submitted to two breathalyzer tests. The tests revealed alcohol concentrations of only .029% and .027%. In light of these relatively low results, the officers suspected that Hammonds' symptoms of intoxication reflected drug use, and they summoned a drug recognition expert. The expert administered a series of tests designed to detect possible drug impairment and concluded that Hammonds was under the influence of drugs. Based upon this opinion, the officers asked Hammonds to provide a urine sample.

¶ 4    Laboratory testing of the sample revealed the presence of carboxy THC, a metabolite of marijuana. The test also revealed the presence of meprobamate and hydroxy-carisoprodol, metabolites of the prescription drug Soma. Expert testimony presented at a pretrial hearing established that metabolites of a drug are a product of the body's metabolizing, or breaking down, the original drug into discrete components. It is only when the drug is in the bloodstream that it is capable of impairment of driving skills, and this impairment lasts only so long as the drug is in the bloodstream. At the metabolite stage, the metabolic component detected in the urine is "inactive," in the sense that it is incapable of causing impairment. Many drugs will continue to appear in the urine in metabolite form for days or even weeks after use. A urine test, while indicative of what has been in the bloodstream in the past, says nothing conclusive about what is presently in the bloodstream.

¶ 5    Hammonds was charged with two counts of aggravated DUI in violation of

Arizona Revised Statutes Annotated ("A.R.S.") section 28–697 (Supp.1997), with count 1 premised on violating A.R.S. section 28–692(A)(1) (Supp.1997) (driving under the influence), and count 2 premised on violating A.R.S. section 28–692(A)(3) (Supp.1997) (driving with a drug or metabolite in the body)[1]. The state also filed an allegation of one historical prior felony conviction. Prior to trial, Hammonds moved to dismiss the "metabolite" count on equal protection grounds. Hammonds' motion was denied, as was his motion for reconsideration.

¶ 6    At trial, the jury acquitted Hammonds of aggravated driving under the influence, but convicted him of the metabolite count.[2] Hammonds admitted the historical prior felony and was sentenced to an enhanced presumptive term of 4.5 years imprisonment. He timely appealed, raising the single issue that section 28–692(A)(3) is violative of equal protection.

## ANALYSIS

¶ 7    The gravamen of Hammonds' equal protection challenge is that A.R.S. section 28–692(A)(3) is irrationally overinclusive. With respect to the perceived aim of the statute, Hammonds agrees that the legislature may legitimately place drivers who are drug impaired in a classification whereby such drivers are subject to criminal sanction. However, Hammonds asserts the statute sweeps more broadly than necessary by including drivers who have only a metabolite of a drug in their urine, when the scientific evidence shows that a metabolite in the urine not only does not necessarily indicate an impairment to drive, it cannot even rule out that the drug may have been used long before the driving. Thus, concludes Hammonds, the gross imprecision of the statute offends equal protection by catching up persons who are committing no crime contemplated by the statute and subjecting them to

---

1.    These statutes have now been renumbered respectively as A.R.S. sections 28–1383 and 28–1381(A)(1), (3) (1998).

2.    Hammonds had a prescription for the Soma and this was presented in evidence. Count 2 went to the jury on both the Soma and marijuana metabolites and we do not know from the verdict

whether the jury accepted the prescription defense, *see* A.R.S. section 28–692(B), and acquitted Hammonds for the Soma metabolite. Even if they did, his conviction is sustainable for the marijuana metabolite, thus providing us with a justiciable controversy on this appeal.

criminal sanctions along with those properly ensnared by the law.

¶ 8 Hammonds concedes that A.R.S. section 28–692(A)(3) does not touch upon a protected class or a fundamental right and therefore agrees that the statute is to be scrutinized under the "rational basis" test for its equal protection implications. *See State v. Phillips,* 178 Ariz. 368, 371, 873 P.2d 706, 709 (App.1994). Under that test, to pass muster, a statute must be rationally related to furthering a legitimate governmental interest. *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Hammonds attacks only the rational relationship prong of the test, admitting that the removal of drug-impaired drivers from the roadways, and thereby reducing the harm they cause, is a legitimate governmental objective. *See Phillips,* 178 Ariz. at 371, 873 P.2d at 709 (stating that Arizona's DUI laws were "designed to protect the public by reducing the terrible toll of life and limb on our roads").

¶ 9 Hammonds has the burden of proving his constitutional challenge. Legislation is presumed rational, and such presumption can be overcome only by a clear showing of arbitrariness or irrationality. *Lerma v. Keck,* 186 Ariz. 228, 233, 921 P.2d 28, 33 (App.1996). In *Phillips,* we responded to an equal protection challenge to section 28–692(A)(3) which argued for similar reasons that the statute was irrational. 178 Ariz. at 371–72, 873 P.2d at 709–10. We found that the statute created a flat ban on driving with any proscribed substance in the body, whether capable of causing impairment or not. We further found that this prohibition was permissible under the police power because, unlike alcohol, there was no acceptable level of drug use that could be quantified so as to distinguish between users who could drive unimpaired and those who were presumptively impaired. *Id.* Consequently, we found that the legislature could have reasonably concluded that no level of illicit drug use could be acceptably combined with driving a vehicle. *Id.* It was therefore entirely rational for the legislature to respond to this reality with the flat ban the statute imposed. 178 Ariz. at 372, 873 P.2d at 710.

¶ 10 In addition to the rationale of *Phillips,* the record in this case discloses other cogent reasons why the flat ban of the statute is rationally related to reducing the carnage on our streets and highways. Expert testimony in this case established that the presence of an inactive and nonimpairing metabolite of an illicit drug in a driver's urine does not necessarily mean that there is no active component of that drug present in the driver's blood. Although a metabolite may remain in the urine substantially longer than its active and impairing parent remains in the bloodstream, the metabolic process begins almost immediately after ingestion. The length of time it takes for a drug to metabolize completely into its discrete components varies from drug to drug and person to person. Thus, while a urine test detecting metabolites does not conclusively establish the presence of the active proscribed parent drug in the bloodstream, neither does it rule it out, because the metabolite and the active parent will often be present in the body simultaneously.

¶ 11 In seeking to protect the life and health of its citizenry, the legislature cannot be required to forego an effective prophylactic measure simply because it may be somewhat imprecise. As the evidence here demonstrates, there is a rational basis for believing that the presence of an illicit drug's metabolite establishes the possibility of the presence of the active, impairing component of the drug. This possibility in turn justifies the legislature banning entirely the right to drive when the metabolite is present.

¶ 12 There is another significant reason to find this statute comports with equal protection. We have held that we will sustain a statute under the rational basis test if it furthers **any** legitimate governmental interest. *See Lerma,* 186 Ariz. at 233, 921 P.2d at 33 (in determining whether legislation furthers legitimate interest, court may consider legislature's actual purpose or hypothetical basis upon which it could have acted); *In re Lara,* 731 F.2d 1455, 1460 n. 7 (9th Cir.1984) (in determining rational basis for classification, reviewing court is not bound by justifications articulated by state at time of legislation's enactment). Hammonds' argu-

ment assumes that the only governmental interest implicated by section 28–692(A)(3) is the detection of impaired drivers and their removal from the roadways. To the extent that the statute is broader than necessary to achieve this objective, it arguably also has the effect of generally deterring illegal drug use, another legitimate governmental interest. That the legislature may have intended that the statute further such a secondary objective is evident in its decision to provide a "safe harbor" provision for those who operate vehicles with legal prescription drugs in their bodies. *See* A.R.S. § 28–692(B) (providing that a prescription for a drug in question is an affirmative defense to a charge of driving with a drug or metabolite in the body, so long as the driver is not actually impaired by the prescription drug). This secondary objective buttresses our conclusion that section 28–692(A)(3) is a rational exercise of legislative power. *See also Stevenson v. State,* 264 Ga. 892, 453 S.E.2d 18, 20 (1995) (noting lack of quantifiable standard of impairment for illegal drug raises less cause for concern than for alcohol, where state law prohibits the use of the drug anyway, without regard to the operation of a motor vehicle).

¶ 13 Hammonds nevertheless contends that the method chosen by the legislature in section 28–692(A)(3) to detect and remove drug-impaired drivers from the roads must be invalidated because there is a more precise way to detect such drivers. Based on the expert testimony presented in this case, Hammonds notes that blood testing can detect the presence of the active component of a proscribed drug. Because actual impairment occurs only when that component is in the bloodstream, Hammonds argues such testing should be the required protocol for a section 28–692(A)(3) violation. This would thereby limit the reach of that statute to those drivers actually impaired and eliminate its overbroad reach which can now sweep in unimpaired drivers.

¶ 14 We reject this argument for three reasons, the first a practical one. Hammonds' argument assumes that blood testing for the parent drug would be as effective a means of detecting and removing impaired drivers as urine testing for metabolites. However, while a urine sample can be provided to an officer at a police station or jail facility, A.R.S. section 28–692(F) (Supp.1997) requires that a blood draw be made by a physician, a registered nurse, or "another qualified person." Obviously, that requirement would place a significant additional burden on the state, and it could very well result in less efficient enforcement. This is inconsistent with the legislative goal of detecting and removing as many impaired drivers as possible.

¶ 15 Second, as already noted, urine testing for metabolites does contribute to detection of impaired drivers because detection of a metabolite indicates that the driver may also have the active component present. That this method is less precise in detecting and removing impaired drivers than blood testing does not render it violative of equal protection. Under the rational basis test, the legislature need not choose the least intrusive, nor most effective, means of achieving its goals. *See Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 491, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) (holding that statute was not irrational simply because it provides only "rough justice"). Rather, a statute offends equal protection only if it is "wholly irrelevant" to the achievement of a legitimate governmental objective. *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). That is not the case here.

¶ 16 Third, blood testing may be counterproductive in effecting the secondary purpose of section 28–692(A)(3) to deter drug use generally. If a driver is impaired from recently using a prescription drug, and has also used marijuana at some time in the past, metabolite testing of urine will detect the marijuana metabolite as well as the prescription drug metabolite. Blood testing, on the other hand, would detect only the active component of the prescription drug and would not detect any evidence of marijuana use if the marijuana had completely metabolized. Thus, urine testing better serves the statute's multiple purposes and we conclude that

requiring blood testing as part of the statutory protocol is unwarranted.[3]

## CONCLUSION

¶ 17 Hammonds has failed to clearly show that the prohibition against driving while a metabolite of a drug is in the driver's body is not rationally related to the legitimate governmental objectives of removing impaired drivers from the roadways as well as reducing illegal drug use. Consequently, we find that the prohibition does not violate the equal protection clause of either the federal or the Arizona constitutions. We therefore affirm Hammonds' conviction and sentence.

GERBER, P.J., and TOCI, J., concur.

---

**3.** Hammonds also cites to and relies on our holding in *Weller v. Arizona Department of Economic Security*, 176 Ariz. 220, 860 P.2d 487 (App.1993). We find that reliance misplaced. In *Weller*, the employer had a rule that a positive test for any level of metabolites of marijuana in an employee's urine warranted termination. We held that this rule was not sufficiently work-related or reasonable to disqualify the employee from receiving unemployment compensation. We did not rule that the employee could not be terminated, but simply recognized the distinction between misconduct justifying termination and misconduct disqualifying an employee from unemployment benefits. In drawing this distinction for purposes of construing the involved statutes, we emphasized that the unemployment compensation system was intended to be "generously protective of workers and their families." *Id.* at 221–25, 860 P.2d at 488–92. The legislative policies controlling the issue of statutory construction raised in *Weller* are simply irrelevant to the constitutional question presented here.