IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA, EX REL. WILLIAM G. MONTGOMERY, MARICOPA
COUNTY ATTORNEY,
*Petitioner*

*v.*

THE HONORABLE MYRA HARRIS, COMMISSIONER OF THE SUPERIOR COURT
OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Commissioner*

HRACH SHILGEVORKYAN,
*Real Party in Interest*

No. CV-13-0056-PR
Filed April 22, 2014

Appeal from the Arcadia Biltmore Justice Court
The Honorable David Fletcher, Judge Pro Tempore
No. TR 2011-100433
**AFFIRMED**

Appeal from the Superior Court in Maricopa County
The Honorable Myra Harris, Commissioner
No. LC 2011-100433-001
**AFFIRMED**

Opinion of the Court of Appeals, Division One
232 Ariz. 76, 301 P.3d 580 (2013)
**VACATED**

COUNSEL:

William G. Montgomery, Maricopa County Attorney, Andrea L. Kever, Deputy County Attorney, Susan L. Luder, Deputy County Attorney (argued), Phoenix, for State of Arizona

Clark L. Derrick, Rhonda E. Neff, Kimerer & Derrick, P.C., Phoenix; and Michael Alarid, III (argued), Law Offices of David Michael Cantor, P.C., Phoenix, for Hrach Shilgevorkyan

1

Stephen Paul Barnard, Law Offices of Stephen Paul Barnard P.C., Tucson; Joe St. Louis, Nesci & St. Louis, PLLC, Tucson; and Lawrence S. Koplow, Ridenour Hienton & Lewis, PLLC, Phoenix, for Amicus Curiae Arizona Attorneys for Criminal Justice

Jon Eliason, Mesa City Prosecutor, Molly Lynch, Assistant City Prosecutor, Mesa, for Amicus Curiae Mesa City Prosecutor's Office

JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BERCH, VICE CHIEF JUSTICE BALES and JUSTICE PELANDER joined, and JUSTICE TIMMER dissented.

JUSTICE BRUTINEL, opinion of the Court:

¶1 Arizona Revised Statutes § 28-1381(A)(3) makes it unlawful for a driver to be in actual physical control of a vehicle if there is "any drug defined in [A.R.S.] § 13-3401 or its metabolite in the person's body." We are asked to determine whether the phrase "its metabolite" includes Carboxy-Tetrahydrocannabinol ("Carboxy-THC"), a non-impairing metabolite of Cannabis,[1] a proscribed drug listed in § 13-3401. We conclude that it does not.

## I.

¶2 Police stopped a vehicle driven by Hrach Shilgevorkyan for speeding and making unsafe lane changes. Suspecting that he was impaired, officers administered field sobriety tests. After participating in the tests, Shilgevorkyan admitted that he had smoked some "weed" the night before and voluntarily submitted to a blood test that revealed Carboxy-THC in his blood.

¶3 The State charged Shilgevorkyan with two counts of driving under the influence. Count one alleged a violation of A.R.S. § 28-1381(A)(1) ("the (A)(1) charge"), which prohibits a person from driving a vehicle in Arizona "[w]hile under the influence of . . . any drug . . . if the person is impaired to the slightest degree." Count two alleged a violation

---

[1] Cannabis is commonly referred to as marijuana and as defined in A.R.S. § 13-3401(4)(b) includes tetrahydrocannabinol ("THC"), its primary psychoactive component.

of A.R.S. § 28-1381(A)(3) ("the (A)(3) charge"), which prohibits driving a vehicle "[w]hile there is any drug defined in § 13-3401 or its metabolite in the person's body."

¶4        Shilgevorkyan moved to dismiss the (A)(3) charge, arguing that the blood test revealed neither the presence of THC nor "its metabolite" Hydroxy-Tetrahydrocannabinol ("Hydroxy-THC"). At an evidentiary hearing, the State presented expert witness testimony that: (1) marijuana has "many, many metabolites," (2) Hydroxy-THC and Carboxy-THC are the two major marijuana metabolites, (3) although it is possible to test for Hydroxy-THC in the blood, the Arizona Department of Public Safety chooses not to do so because Hydroxy-THC does not "exist in the blood for very long" and is quickly converted to Carboxy-THC, (4) Carboxy-THC is inactive and does not cause impairment, and (5) Carboxy-THC can remain in a person's body for as many as twenty-eight to thirty days after the ingestion of marijuana.

¶5        At the conclusion of the hearing, the justice court dismissed the (A)(3) charge, and the State voluntarily dismissed the (A)(1) charge. The State appealed to the superior court, which affirmed. That court reasoned that the word "metabolite" in § 28-1381(A)(3) is ambiguous because it is unclear whether it should be read as singular or plural. Although the court acknowledged that Carboxy-THC is a marijuana metabolite, it was unconvinced that the legislature intended to include all possible byproducts — particularly those that are inactive and cannot impair the driver.

¶6        The State then filed a petition for special action with the court of appeals, which accepted jurisdiction and granted relief. *State ex rel. Montgomery v. Harris ex rel. Cnty. of Maricopa*, 232 Ariz. 76, 301 P.3d 580 (App. 2013). The court held that "§ 28-1381(A)(3)'s language prohibiting driving with a proscribed drug or 'its metabolite' includes the metabolite Carboxy-THC," *id.* ¶ 14, based on the reasoning in *State v. Hammonds*, 192 Ariz. 528, 968 P.2d 601 (App. 1998), and *State v. Phillips,* 178 Ariz. 368, 873 P.2d 706 (App. 1994). The court in *Hammonds* held that the (A)(3) offense was not "irrationally overinclusive," 192 Ariz. at 530, 968 P.2d at 603, and the court in *Phillips* determined that it was not unconstitutionally vague or overbroad, 178 Ariz. at 370, 873 P.2d at 708. The court of appeals noted that although neither case considered the meaning of "metabolite," they demonstrated that A.R.S. § 28-1381(A)(3) "must be interpreted broadly to

appropriately effectuate the legislative purpose and intent underpinning the statutory language." *Montgomery*, 232 Ariz. at 79 ¶ 14, 301 P.3d at 583.

¶7 We granted review because whether § 28-1381(A)(3) applies to non-impairing metabolites presents a recurring issue of statewide importance. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

### A.

¶8 We review questions of statutory interpretation de novo. *State v. Hansen*, 215 Ariz. 287, 289 ¶ 6, 160 P.3d 166, 168 (2007). When interpreting a statute, our goal is to "fulfill the intent of the legislature that wrote it." *Bilke v. State*, 206 Ariz. 462, 464 ¶ 11, 80 P.3d 269, 271 (2003). "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Hansen*, 215 Ariz. at 289 ¶ 7, 160 P.3d at 168.

¶9 The term "metabolite" is not defined by statute. When statutory terms are undefined, courts may reference dictionaries. *State v. Wise*, 137 Ariz. 468, 470 n.3, 671 P.2d 909, 911 n.3 (1983); *see Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 384 ¶ 15, 296 P.3d 42, 47 (2013). A standard medical dictionary defines metabolite as "[a]ny product of metabolism." Taber's Cyclopedic Medical Dictionary 1349 (20th ed. 2005). It defines metabolism in pertinent part, as "the sum of all physical and chemical changes that take place within an organism." *Id.* These definitions comport with the State's expert's testimony, which defined "metabolite" as "any chemical compound that is produced during the process of metabolism, the breakdown process of getting rid of a drug or substance."

¶10 Shilgevorkyan argues that the meaning of "its metabolite" in § 28-1381(A)(3) is clear. He asserts that because the statute uses the possessive singular, it prohibits only Hydroxy-THC, the initial product of the metabolism of THC. Labeling Hydroxy-THC the "primary" metabolite, he contends the statute does not include the products of the further breakdown of Hydroxy-THC into subsequent or "secondary" metabolites such as Carboxy-THC. He further argues that interpreting

"metabolite" in the plural expands the statutory definition to include a "secondary non-psychoactive metabolite . . . [that] does not cause impairment," which is inconsistent with the legislature's intent to criminalize driving under the influence of an intoxicating substance. The State, on the other hand, argues we should construe "metabolite" in the plural in accordance with A.R.S. § 1-214(B), which generally provides that statutory "[w]ords in the singular . . . include the plural . . . ."

¶11        There is more than one plausible meaning for the phrase "its metabolite," whether read as singular or plural. The argument that "its metabolite," although phrased in the singular, includes all of a proscribed drug's byproducts is reasonable based on § 1-214(B). Conversely, the argument that the statutory language reflects the legislature's intent to only penalize drivers with primary or impairment-causing metabolites in their system is equally reasonable. Additionally, even if read in the plural, "metabolites" could reasonably mean multiple primary metabolites for drugs having more than one rather than both primary and secondary metabolites.

¶12        Because the term "its metabolite" is reasonably susceptible to differing interpretations, the statute is ambiguous and we cannot determine from the term alone whether the legislature intended to penalize the presence of any byproduct, including Carboxy-THC, in a driver's blood. *See Arizona Citizens Clean Elections Com'n v. Brain*, CV-13-0341-PR, 2014 WL 1307659, at *4 ¶ 13 (Ariz. Apr. 2, 2014); *see also* Joshua C. Snow, *The Unconstitutional Prosecution of Controlled Substance Metabolites Under Utah Code § 41-6A-517*, 2013 Utah L. Rev. OnLaw 195, 198 (2013) ("Although [per se DUI] statutes are purportedly designed to make prosecution simpler and more effective by removing the necessity to prove impairment or quantifiable levels of drugs in the system, the statutes are rife with ambiguity and complexity, which weaken their legitimacy and validity."). Accordingly, we look to secondary rules of statutory construction to determine § 28-1381(A)(3)'s meaning.

**B.**

¶13        Statutes should be construed sensibly to avoid reaching an absurd conclusion. *Mendelsohn v. Super. Ct. in and for Maricopa Cnty.*, 76 Ariz. 163, 169, 261 P.2d 983, 987–88 (1953). When a statute's meaning cannot be discerned from its language alone, "we attempt to determine

legislative intent by interpreting the statute as a whole, and consider 'the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose.'" *Calik v. Kongable*, 195 Ariz. 496, 500 ¶ 16, 990 P.2d 1055, 1059 (1999) (quoting *Aros v. Beneficial Arizona, Inc.*, 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999)). Courts also consider "the policy behind the statute and the evil it was designed to remedy." *State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). Furthermore, we consider a statute "in light of its place in the statutory scheme," *Grant v. Bd. of Regents of Univ. and State Colls. of Ariz.*, 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982), and although statutory title headings are not part of the law, they can aid in its interpretation, *State v. Barnett*, 142 Ariz. 592, 597, 691 P.2d 683, 688 (1984).

¶14 The State's interpretation that "its metabolite" includes *any* byproduct of a drug listed in § 13-3401 found in a driver's system leads to absurd results. *See State v. Estrada*, 201 Ariz. 247, 251 ¶ 14, 34 P.3d 356, 360 (2001) (observing that a "result is absurd if it is so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of persons with ordinary intelligence and discretion") (internal quotation marks omitted).

¶15 Most notably, this interpretation would create criminal liability regardless of how long the metabolite remains in the driver's system or whether it has any impairing effect. For example, at oral argument the State acknowledged that, under its reading of the statute, if a metabolite could be detected five years after ingesting a proscribed drug, a driver who tested positive for trace elements of a non-impairing substance could be prosecuted.

¶16 Additionally, this interpretation would criminalize otherwise legal conduct. In 2010, Arizona voters passed the Arizona Medical Marijuana Act ("AMMA"), legalizing marijuana for medicinal purposes. A.R.S. § 36-2801 *et seq*. Despite the legality of such use, and because § 28-1381(A)(3) does not require the State to prove that the marijuana was illegally ingested, prosecutors can charge legal users under the (A)(3) provision. Because Carboxy-THC can remain in the body for as many as twenty-eight to thirty days after ingestion, the State's position suggests that a medical-marijuana user could face prosecution for driving any time nearly a month after they had legally ingested marijuana. Such a prohibition would apply even when the driver had no impairing

substance in his or her body and notwithstanding the State's ability to test both for THC, the primary substance that causes impairment, and Hydroxy-THC, the metabolite capable of causing impairment.

¶17         Finally, this interpretation would allow the prosecution of an individual who drives after ingesting a legal substance that shares a non-impairing metabolite with a proscribed substance. For example, serotonin, a legal substance, and the proscribed drug bufotenine share a common metabolite, 5-hydroxindoleactic acid ("5-HIAA").[2] *See* Kärkkäinen, Jorma, et al., *Urinary excretion of bufotenin (N, N -dimethyl-5-hydroxytryptamine) is increased in suspicious violent offenders: A confirmatory study*, 58 Psychiatry Research, 145 (1995); Moore, Todd M., et al., *A meta-analysis of serotonin metabolite 5-HIAA and antisocial behavior*, 28 Aggressive Behavior, 299 (2002). Under the State's interpretation of "metabolite," it could prosecute a driver who had 5-HIAA in his or her system after ingesting a legal serotonin supplement or, for that matter, whose blood contains 5-HIAA as a byproduct of naturally produced serotonin. Because § 28-1381(A)(3) does not require the State to prove that a substance discovered in a driver's body is actually metabolized from a proscribed drug, the State's interpretation would permit prosecution if the discovered substance is a metabolite of a proscribed drug even if the proscribed drug was never ingested. These results are absurd and make the State's argument untenable.[3]

---

[2]     Bufotenine, proscribed by A.R.S. § 13-3401(6)(a)(v), is a hallucinogenic drug generally ingested by licking the backs of cane toads. *See* Christen Conger, *Are there really hallucinogenic frogs?*, HOW STUFF WORKS (August 12, 2008), http://www.science. howstuffworks.com/ zoology/reptiles-amphibians/hallucinogenic-frog1.htm

[3]     The Dissent notes that under its plain language interpretation, § 28-1381(A)(3) might be constitutionally challenged as applied to a driver who had ingested a legal (or naturally occurring) substance that shares a metabolite with an illegal drug or who legally ingested marijuana. Dissent at ¶ 31. In support of this assertion the Dissent cites *State v. Boyd*, 201 Ariz. 27, 29–30 ¶¶ 12–13, 31 P.3d 140, 142–43) (App. 2001), which held § 28-1381(A)(3), as applied, void for vagueness, *id.* That § 28-1381(A)(3) is subject to more than one reasonable interpretation, one of which might render it unconstitutional, highlights its ambiguity. Furthermore, we "construe statutes, when possible, to avoid constitutional difficulties."

**C.**

**¶18** The legislative history behind § 28-1381(A)(3) reflects that the legislature sought to prevent impaired driving. The statute was added in 1990 by House Bill ("H.B.") 2433. A Senate fact sheet explained that H.B. 2433's purpose was to "make numerous substantive and conforming changes to the provisions relating to the offense of driving under the influence of liquor or drugs." STAFF OF ARIZ. S., 39TH LEGIS. 2D SESSION, H.B. 2433 FACT SHEET, at 1 (June 21, 1990).

**¶19** Section 28-1381(A)(3)'s placement within the statutory scheme also demonstrates a legislative intent to prevent and punish impaired driving, not simply driving while having a non-impairing metabolite in one's system. The "its metabolite" language appears in the "Driving Under the Influence" section of Arizona's statutes. A.R.S. Chapter 4, art. 3. And the statute's title begins "Driving or actual physical control *while under the influence . . . .*" A.R.S. § 28-1381 (emphasis added).

**¶20** Consistent with this legislative history, the court of appeals has noted that "[t]he state has a compelling legitimate interest in protecting the public from drivers whose ability may be impaired by the consumption of controlled substances . . . ." *Phillips*, 178 Ariz. at 372, 873 P.2d at 710. The court further explained that the (A)(3) charge was enacted as a part of comprehensive DUI legislation "designed to protect the public by 'reducing the terrible toll of life and limb' on our roads." *Id.* (quoting *Fuenning v. Supr. Ct. in and for Maricopa Cnty.*, 139 Ariz. 590, 595, 680 P.2d 121, 126 (1983)).

**¶21** This legislative intent is further evidenced by A.R.S. § 28-1381(A)(2), which provides that "[i]t is unlawful for a person to drive or be in actual physical control of a vehicle . . . [i]f the person has an alcohol concentration of 0.08 or more within two hours of driving or being in actual physical control of the vehicle . . . ." Neither the (A)(2) nor (A)(3) charge requires that the State prove impairment. The (A)(2) charge creates a per se threshold at which a driver is presumed to be under the influence. *See State v. Cooperman*, 232 Ariz. 347, 350 ¶ 10, 306 P.3d 4, 7 (2013) (explaining that under § 28-1381(A)(2), whether the driver was impaired

---

*State v. Gomez*, 212 Ariz. 55, 60 ¶ 28, 127 P.3d 873, 878 (2006) (citing *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994)).

does not matter — the only pertinent questions are whether the alcohol concentration exceeded 0.08 and the reading was taken within two hours of driving or being in actual physical control of the vehicle).

**¶22** Similarly, in enacting the (A)(3) charge, the legislature sought to proscribe driving by those who could be impaired from the presence of illegal drugs in their body. However, unlike alcohol, there is no generally applicable concentration that can be identified as an indicator of impairment for illegal drugs. *Phillips,* 178 Ariz. at 372, 873 P.2d at 710 (explaining that drugs' potency cannot be accurately predicted); *see also* Gary M. Reisfield et al., *The Mirage of Impairing Drug Concentration Thresholds: A Rationale for Zero Tolerance* Per Se *Driving under the Influence of Drugs Laws*, 36 J. Analytical Toxicology 353 (2012) (explaining that multiple phenomena make the task of establishing impairing concentrations impossible). The (A)(3) charge establishes that a driver who tests positive for any amount of an impairing drug is legally and irrefutably presumed to be under the influence. Although the legislature could rationally choose to penalize the presence of any amount of an impairing metabolite, we do not believe that the legislature contemplated penalizing the presence of a metabolite that is not impairing.

**¶23** We find that the legislature intended to prohibit driving with any amount of an impairing substance resulting from a drug proscribed in § 13-3401 in the body. The State, however, essentially contends that the legislature intended a law that punishes *driving under the influence* to also punish drivers who it cannot prove were under the influence or had any impairing substance in their system at the time of driving. We are not persuaded and reject the State's argument that § 28-1381(A)(3) "creates a flat ban on the presence of any drug or its metabolite in a person's body while driving or in actual physical control of a vehicle," even when the only metabolite found is not impairing. But we likewise reject Shilgevorkyan's argument that "its metabolite" means only the primary metabolite, because there are drugs proscribed under § 13-3401 that have multiple primary or secondary impairing metabolites. *See, e.g., Diazepam,* National Highway Traffic Safety Administration, http://www.nhtsa.gov/people/injury/research/job185drugs/diazepam. htm (last visited April 2, 2014) (explaining that diazepam has multiple psychoactive metabolites).

¶24　　　　Because the legislature intended to prevent impaired driving, we hold that the "metabolite" reference in § 28-1381(A)(3) is limited to any of a proscribed substance's metabolites that are capable of causing impairment.[4]　Accordingly, marijuana users violate § 28-1381(A)(1) if they drive while "impaired to the slightest degree," and, regardless of impairment, violate (A)(3) if they are discovered with any amount of THC or an impairing metabolite in their body.  Drivers cannot be convicted of the (A)(3) offense based merely on the presence of a non-impairing metabolite that may reflect the prior usage of marijuana.

**V.**

¶25　　　　The record establishes that Carboxy-THC, the only metabolite found in Shilgevorkyan's blood, does not cause impairment. Accordingly, we vacate the court of appeals' opinion and affirm the trial court's dismissal of the (A)(3) charge.

---

[4]　　　In light of our holding that "its metabolite" does not include Carboxy-THC, we do not address Shilgevorkyan's various constitutional arguments.

JUSTICE TIMMER, dissenting:

¶26        Arizona is one of at least seven states that combats drugged driving with a zero-tolerance, per se ban on driving with any controlled substance or its metabolite in the body.  Joshua C. Snow, *The Unconstitutional Prosecution of Controlled Substance Metabolites Under Utah Code § 41-6A-517*, 2013 Utah L. Rev. OnLaw 195, 197–98 & n.14 (2013).  One of these states, Delaware, explicitly excludes inactive metabolites from its per se ban.  Del. Code Ann. tit. 21, § 4177(c)(10) (West 2014).  The Majority aligns Arizona with Delaware by construing A.R.S. § 28-1381(A)(3) in a manner that contradicts its plain meaning.  I respectfully dissent.

¶27        The Majority holds that § 28-1381(A)(3) is ambiguous because the phrase "its metabolite" can mean all of a proscribed drug's metabolites, some of its metabolites, or only those that can cause impairment.  *See* Op. ¶ 11.  But "metabolite" has an accepted meaning, *see* Taber's Cyclopedic Medical Dictionary 1349 (20th ed. 2005), and nothing in the language of § 28-1381 suggests that the legislature intended to exclude certain types of metabolites from the statutory prohibition.  Because § 28-1381(A)(3) "admits of only one meaning," it is not ambiguous.  *See Parrot v. DaimlerChrysler Corp.*, 212 Ariz. 255, 257 ¶ 7, 130 P.3d 530, 532 (2006); *see also State v. Phillips*, 178 Ariz. 368, 371, 873 P.2d 706, 709 (App. 1994) ("We fail to see how section [28-1381(A)(3)] is ambiguous in any way.  It precisely defines, in unequivocal terms, the type of behavior prohibited[.]").

¶28        I also disagree with the Majority that the legislature must have intended something different from what it plainly stated in § 28-1381(A)(3) because imposing a flat ban on driving with any metabolite of an illegal drug in the body is absurd.  *See* Op. ¶¶ 14–17.  The legislature reasonably could have concluded that a zero-tolerance provision would most effectively enhance detection and prosecution of drugged driving.

¶29        First, the difficulty of detecting drug impairment justifies a flat ban.  *See Phillips*, 178 Ariz. at 372, 873 P.2d at 710 (noting that, unlike the case with alcohol impairment, "there is no useful indicator of impairment from . . . drugs because they are fundamentally different from alcohol").  For example, an expert witness in this case testified that Hydroxy-THC converts quickly to Carboxy-THC, which is why law

11

enforcement typically does not test blood for Hydroxy-THC. Thus, a driver with Carboxy-THC in the blood at the time of testing may or may not have had Hydroxy-THC in the blood while driving. The flat ban ensures that a driver who had an impairing substance in the body while driving is prosecuted even though that substance may have quickly metabolized into a non-impairing substance.

¶30 Second, the flat ban permits law enforcement to detect drugged driving by testing urine as well as blood. "[W]hile a urine test detecting metabolites does not conclusively establish the presence of the active proscribed parent drug in the bloodstream, neither does it rule it out, because the metabolite and the active parent will often be present in the body simultaneously." *State v. Hammonds*, 192 Ariz. 528, 531 ¶ 10, 968 P.2d 601, 604 (App. 1998). Imposing a flat ban on driving with a metabolite of a controlled substance in the body enhances law enforcement's ability to detect drugged driving. *Cf. id.* ¶ 11 ("In seeking to protect the life and health of its citizenry, the legislature cannot be required to forego an effective prophylactic measure simply because it may be somewhat imprecise.").

¶31 The Majority contends that a flat ban is absurd because it permits prosecution if the non-impairing metabolite in the driver's body derives from ingesting either medically authorized marijuana or a legal substance that shares a metabolite with a controlled substance. *See* Op. ¶¶ 16–17. These isolated examples do not make the flat ban on the presence in the body of hundreds of proscribed drugs or their metabolites absurd. Either scenario described by the Majority would unquestionably trigger constitutional scrutiny that might invalidate § 28-1381(A)(3) as applied in particular circumstances. *Cf. State v. Boyd*, 201 Ariz. 27, 29–30 ¶¶ 12–13, 31 P.3d 140, 142–43 (App. 2001) (holding that although "A.R.S. § 28-1381(A)(3) is not facially vague," applying it to a defendant who consumed a legal product, GBL, that metabolized into GHB, a proscribed substance, was unconstitutional as applied to the defendant because it "fail[ed] to give him adequate notice that his actions were illegal"). And § 28-1381(A)(3) might not apply if the detected metabolites — active or inactive — emanated from medically authorized marijuana use. *See* A.R.S. § 28-1381(D) ("A person using a drug as prescribed by a medical practitioner licensed pursuant to title 32, chapter 7, 11, 13 or 17 is not guilty of violating subsection A, paragraph 3 of this section."). This case does not present either situation.

**¶32** I share some of the Majority's concerns about imposing a zero-tolerance, per se ban on driving with the presence of non-impairing metabolites in the body. But because § 28-1381(A)(3) clearly and unambiguously reflects that the legislature intended this result, it is not appropriate to employ secondary canons of statutory construction to find a different meaning. Any constitutional challenges to this provision should be addressed on a case-by-case basis. I would affirm the court of appeals' opinion.