justice BRUTINEL,
opinion of the Court.
¶ 1 Arizona Revised Statutes § 28-1381(A)(3) makes it unlawful for a driver to be in actual physical control of a vehicle if there is “any drug defined in [AR.S.] § 13-3401 or its metabolite in the person’s body.” We are asked to determine whether the phrase “its metabolite” includes Carboxy-Tetrahydrocannabinol (“Carboxy-THC”), a non-impairing metabolite of Cannabis,[1] a proscribed drug listed in § 13-3401. We conclude that it does not.
I.
¶ 2 Police stopped a vehicle driven by Hrach Shilgevorkyan for speeding and making unsafe lane changes. Suspecting that he was impaired, officers administered field sobriety tests. After participating in the tests, Shilgevorkyan admitted that he had smoked some “weed” the night before and voluntarily submitted to a blood test that revealed Car-boxy-THC in his blood.
¶ 3 The State charged Shilgevorkyan with two counts of driving under the influence. Count one alleged a violation of A.R.S. § 28-1381(A)(1) (“the (A)(1) charge”), which prohibits a person from driving a vehicle in Arizona “[wjhile under the influence of ... any drug ... if the person is impaired to the slightest degree.” Count two alleged a violation of A.R.S. § 28-1381(A)(3) (“the (A)(3) charge”), which prohibits driving a vehicle “[w]hile there is any drug defined in § 13-3401 or its metabolite in the person’s body.”
¶ 4 Shilgevorkyan moved to dismiss the (A)(3) charge, arguing that the blood test revealed neither the presence of THC nor “its metabolite” Hydroxy-Tetrahydrocannabinol (“Hydroxy-THC”). At an evidentiary hearing, the State presented expert witness testimony that: (1) marijuana has “many, many metabolites,” (2) Hydroxy-THC and Carboxy-THC are the two major marijuana metabolites, (3) although it is possible to test for Hydroxy-THC in the blood, the Arizona Department of Public Safety chooses not to *344 do so because Hydroxy-THC does not “exist in the blood for very long” and is quickly converted to Carboxy-THC, (4) CarboxyTHC is inactive and does not cause impairment, and (5) Carboxy-THC can remain in a person’s body for as many as twenty-eight to thirty days after the ingestion of marijuana.
¶ 5 At the conclusion of the hearing, the justice court dismissed the (A)(3) charge, and the State voluntarily dismissed the (A)(1) charge. The State appealed to the superior coui’t, which affirmed. That court reasoned that the word “metabolite” in § 28-1381(A)(3) is ambiguous because it is unclear whether it should be read as singular or plural. Although the court acknowledged that Carboxy-THC is a marijuana metabolite, it was unconvinced that the legislature intended to include all possible byproducts— particularly those that are inactive and cannot impair the driver.
¶ 6 The State then filed a petition for special action with the court of appeals, which accepted jurisdiction and granted relief. State ex rel. Montgomery v. Harris ex ret. Cnty. of Maricopa, 232 Ariz. 76, 301 P.3d 580 (App.2013). The court held that “ § 28-1381(A)(3)’s language prohibiting driving with a proscribed drug or ‘its metabolite’ includes the metabolite Carboxy-THC,” id. ¶ 14, based on the reasoning in State v. Hammonds, 192 Ariz. 528, 968 P.2d 601 (App. 1998), and State v. Phillips, 178 Ariz. 368, 873 P.2d 706 (App.1994). The court in Hammonds held that the (A)(3) offense was not “irrationally overinclusive,” 192 Ariz. at 530, 968 P.2d at 603, and the court in Phillips determined that it was not unconstitutionally vague or overbroad, 178 Ariz. at 370, 873 P.2d at 708. The court of appeals noted that although neither case considered the meaning of “metabolite,” they demonstrated that AR.S. § 28-1381(A)(3) “must be interpreted broadly to appropriately effectuate the legislative purpose and intent underpinning the statutory language.” Montgomery, 232 Ariz. at 79 ¶ 14, 301 P.3d at 583.
¶ 7 We granted review because whether § 28-1381(A)(3) applies to non-impairing metabolites presents a recurring issue of statewide importance. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and AR.S. § 12-120.24.
II.
A.
¶ 8 We review questions of statutory interpretation de novo. State v. Hansen, 215 Ariz. 287, 289 ¶ 6, 160 P.3d 166, 168 (2007). When interpreting a statute, our goal is to “fulfill the intent of the legislature that wrote it.” Bilke v. State, 206 Ariz. 462, 464 ¶ 11, 80 P.3d 269, 271 (2003). “[T]he best and most reliable index of a statute’s meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute’s construction.” Hansen, 215 Ariz. at 289 ¶ 7,160 P.3d at 168.
¶ 9 The term “metabolite” is not defined by statute. When statutory terms are undefined, courts may reference dictionaries. State v. Wise, 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983); see Baker v. Univ. Physicians Healthcare, 231 Ariz. 379, 384 ¶ 15, 296 P.3d 42, 47 (2013). A standard medical dictionary defines metabolite as “[a]ny product of metabolism.” Taber’s Cyclopedic Medical Dictionary 1349 (20th ed.2005). It defines metabolism in pertinent part, as “the sum of all physical and chemical changes that take place within an organism.” Id. These definitions comport with the State’s expert’s testimony, which defined “metabolite” as “any chemical compound that is produced during the process of metabolism, the breakdown process of getting rid of a drug or substance.”
¶ 10 Shilgevorkyan argues that the meaning of “its metabolite” in § 28-1381(A)(3) is clear. He asserts that because the statute uses the possessive singular, it prohibits only Hydroxy-THC, the initial product of the metabolism of THC. Labeling Hydroxy-THC the “primary” metabolite, he contends the statute does not include the products of the further breakdown of Hydroxy-THC into subsequent or “secondary” metabolites such as Carboxy-THC. He further argues that interpreting “metabolite” in the plural expands the statutory definition to include a “secondary non-psychoactive metabolite ... [that] does not cause impairment,” which is *345 inconsistent with the legislature’s intent to criminalize driving under the influence of an intoxicating substance. The State, on the other hand, argues we should construe “metabolite” in the plural in accordance with A.R.S. § 1-214(B), which generally provides that statutory “[w]ords in the singular ... include the plural____”
¶ 11 There is more than one plausible meaning for the phrase “its metabolite,” whether read as singular or plural. The argument that “its metabolite,” although phrased in the singular, includes all of a proscribed drug’s byproducts is reasonable based on § 1-214(B). Conversely, the argument that the statutory language reflects the legislature’s intent to only penalize drivers with primary or impairment-causing metabolites in their system is equally reasonable. Additionally, even if read in the plural, “metabolites” could reasonably mean multiple primary metabolites for drags having more than one rather than both primary and secondary metabolites.
¶ 12 Because the term “its metabolite” is reasonably susceptible to differing interpretations, the statute is ambiguous and we cannot determine from the term alone whether the legislature intended to penalize the presence of any byproduct, including Car-boxy-THC, in a driver’s blood. See Arizona Citizens Clean Elections Com’n v. Brain, CV-13-0341-PR, 234 Ariz. 322, 325 ¶ 13, 322 P.3d 139, 2014 WL 1307659, at *4 ¶ 13 (Ariz. Apr. 2, 2014); see also Joshua C. Snow, The Unconstitutional Prosecution of Controlled Substance Metabolites Under Utah Code § il-SA-512013 Utah L.Rev. OnLaw 195, 198 (2013) (“Although [per se DUI] statutes are purportedly designed to make prosecution simpler and more effective by removing the necessity to prove impairment or quantifiable levels of drugs in the system, the statutes are rife with ambiguity and complexity, which weaken their legitimacy and validity.”). Accordingly, we look to secondary rules of statutory construction to determine § 28-1381(A)(3)’s meaning.
B.
¶ 13 Statutes should be construed sensibly to avoid reaching an absurd conclusion. Mendelsohn v. Super. Ct. in and for Maricopa Cnty., 76 Ariz. 163, 169, 261 P.2d 983, 987-88 (1953). When a statute’s meaning cannot be discerned from its language alone, “we attempt to determine legislative intent by interpreting the statute as a whole, and consider ‘the statute’s context, subject matter, historical background, effects and consequences, and spirit and purpose.’” Calilc v. Kongable, 195 Ariz. 496, 500 ¶ 16, 990 P.2d 1055, 1059 (1999) (quoting Aros v. Beneficial Arizona, Inc., 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999)). Courts also consider “the policy behind the statute and the evil it was designed to remedy.” State v. Korzep, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). Furthermore, we consider a statute “in light of its place in the statutory scheme,” Grant v. Bd. of Regents of Univ. and State Colls, of Ariz., 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982), and although statutory title headings are not part of the law, they can aid in its interpretation, State v. Barnett, 142 Ariz. 592, 597, 691 P.2d 683, 688 (1984).
¶ 14 The State’s interpretation that “its metabolite” includes any byproduct of a drug listed in § 13-3401 found in a driver’s system leads to absurd results. See State v. Estrada, 201 Ariz. 247, 251 ¶ 14, 34 P.3d 356, 360 (2001) (observing that a “result is absurd if it is so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of persons with ordinary intelligence and discretion”) (internal quotation marks omitted).
¶ 15 Most notably, this interpretation would create criminal liability regardless of how long the metabolite remains in the driver’s system or whether it has any impairing effect. For example, at oral argument the State acknowledged that, under its reading of the statute, if a metabolite could be detected five years after ingesting a proscribed drag, a driver who tested positive for trace elements of a non-impairing substance could be prosecuted.
¶ 16 Additionally, this interpretation would criminalize otherwise legal conduct. In 2010, Arizona voters passed the Arizona Medical Marijuana Act (“AMMA”), legalizing marijuana for medicinal purposes. A.R.S. § 36- *346 2801 et seq. Despite the legality of such use, and because § 28-1381(A)(3) does not require the State to prove that the marijuana was illegally ingested, prosecutors can charge legal users under the (A)(3) provision. Because Carboxy-THC can remain in the body for as many as twenty-eight to thirty days after ingestion, the State’s position suggests that a medical-marijuana user could face prosecution for driving any time nearly a month after they had legally ingested marijuana. Such a prohibition would apply even when the driver had no impairing substance in his or her body and notwithstanding the State’s ability to test both for THC, the primary substance that causes impairment, and Hydroxy-THC, the metabolite capable of causing impairment.
¶ 17 Finally, this interpretation would allow the prosecution of an individual who drives after ingesting a legal substance that shares a non-impairing metabolite with a proscribed substance. For example, serotonin, a legal substance, and the proscribed drug bufotenine share a common metabolite, 5-hydroxindoleactic acid (“5-HIAA”).[2] See Karkkainen, Jorma, et al., Urinary excretion of bufotenin (N, N — dimethyl-5-hydroxytryptamine) is increased in suspicious violent offenders: A confirmatory study, 58 Psychiatry Research, 145 (1995); Moore, Todd M., et al., A meta-analysis of serotonin metabolite 5-HIAA and antisocial behavior, 28 Aggressive Behavior, 299 (2002). Under the State’s interpretation of “metabolite,” it could prosecute a driver who had 5-HIAA in his or her system after ingesting a legal serotonin supplement or, for that matter, whose blood contains 5-HIAA as a byproduct of naturally produced serotonin. Because § 28-1381(A)(3) does not require the State to prove that a substance discovered in a driver’s body is actually metabolized from a proscribed drug, the State’s interpretation would permit prosecution if the discovered substance is a metabolite of a proscribed drug even if the proscribed drug was never ingested. These results are absurd and make the State’s argument untenable.[3]
C.
¶ 18 The legislative history behind § 28-1381(A)(3) reflects that the legislature sought to prevent impaired driving. The statute was added in 1990 by House Bill (“H.B.”) 2433. A Senate fact sheet explained that H.B. 2433’s purpose was to “make numerous substantive and conforming changes to the provisions relating to the offense of driving under the influence of liquor or drugs.” Staff of Ariz. S., 39th Legis.2d Session, H.B. 2433 Fact Sheet, at 1 (June 21, 1990).
¶ 19 Section 28-1381(A)(3)’s placement within the statutory scheme also demonstrates a legislative intent to prevent and punish impaired driving, not simply driving while having a non-impairing metabolite in one’s system. The “its metabolite” language appears in the “Driving Under the Influence” section of Arizona’s statutes. AR.S. Chapter 4, art. 3. And the statute’s title begins “Driving or actual physical control while under the influence____” AR.S. § 28-1381 (emphasis added).
¶ 20 Consistent with this legislative history, the court of appeals has noted that “[t]he state has a compelling legitimate interest in protecting the public from drivers whose ability may be impaired by the consumption of controlled substances____” Phillips, 178 Ariz. at 372, 873 P.2d at 710. The court *347 further explained that the (A)(3) charge was enacted as a part of comprehensive DUI legislation “designed to protect the public by ‘reducing the terrible toll of life and limb’ on our roads.” Id. (quoting Fuenning v. Supr. Ct. in and for Maricopa Cnty., 139 Ariz. 590, 595, 680 P.2d 121, 126 (1983)).
¶ 21 This legislative intent is further evidenced by AR.S. § 28-1381(A)(2), which provides that “[i]t is unlawful for a person to drive or be in actual physical control of a vehicle ... [i]f the person has an alcohol concentration of 0.08 or more within two hours of driving or being in actual physical control of the vehicle....” Neither the (A)(2) nor (A)(3) charge requires that the State prove impairment. The (A)(2) charge creates a per se threshold at which a driver is presumed to be under the influence. See State v. Cooperman, 232 Ariz. 347, 350 ¶ 10, 306 P.3d 4, 7 (2013) (explaining that under § 28-1381(A)(2), whether the driver was impaired does not matter — the only pertinent questions are whether the alcohol concentration exceeded 0.08 and the reading was taken within two hours of driving or being in actual physical control of the vehicle).
¶ 22 Similarly, in enacting the (A)(3) charge, the legislature sought to proscribe driving by those who could be impaired from the presence of illegal drugs in their body. However, unlike alcohol, there is no generally applicable concentration that can be identified as an indicator of impairment for illegal drugs. Phillips, 178 Ariz. at 372, 873 P.2d at 710 (explaining that drags’ potency cannot be accurately predicted); see also Gary M. Reisfield et al., The Mirage of Impairing Drug Concentration Thresholds: A Rationale for Zero Tolerance Per Se Driving under the Influence of Drugs Laws, 36 J. Analytical Toxicology 353 (2012) (explaining that multiple phenomena make the task of establishing impairing concentrations impossible). The (A)(3) charge establishes that a driver who tests positive for any amount of an impairing drag is legally and irrefutably presumed to be under the influence. Although the legislature could rationally choose to penalize the presence of any amount of an impairing metabolite, we do not believe that the legislature contemplated penalizing the presence of a metabolite that is not impairing.
¶ 23 We find that the legislature intended to prohibit driving with any amount of an impairing substance resulting from a drug proscribed in § 13-3401 in the body. The State, however, essentially contends that the legislature intended a law that punishes driving under the influence to also punish drivers who it cannot prove were under the influence or had any impairing substance in their system at the time of driving. We are not persuaded and reject the State’s argument that § 28-1381(A)(3) “creates a flat ban on the presence of any drug or its metabolite in a person’s body while driving or in actual physical control of a vehicle,” even when the only metabolite found is not impairing. But we likewise reject Shilgevorkyan’s argument that “its metabolite” means only the primary metabolite, because there are drugs proscribed under § 13-3401 that have multiple primary or secondary impairing metabolites. See, e.g., Diazepam, National Highway Traffic Safety Administration, http://www.nhtsa. gov/people/injury/research/jobl85drugs/ diazepam.htm (last visited April 2, 2014) (explaining that diazepam has multiple psyehoactive metabolites).
¶ 24 Because the legislature intended to prevent impaired driving, we hold that the “metabolite” reference in § 28-1381(A)(3) is limited to any of a proscribed substance’s metabolites that are capable of causing impairment.[4] Accordingly, marijuana users violate § 28 — 1381(A)(1) if they drive while “impaired to the slightest degree,” and, regardless of impairment, violate (A)(3) if they are discovered with any amount of THC or an impairing metabolite in their body. Drivers cannot be convicted of the (A)(3) offense based merely on the presence of a non-impairing metabolite that may reflect the prior usage of marijuana.
Y.
¶ 25 The record establishes that CarboxyTHC, the only metabolite found in Shilge *348 vorkyan’s blood, does not cause impairment. Accordingly, we vacate the court of appeals’ opinion and affirm the trial court’s dismissal of the (A)(3) charge.

. Cannabis is commonly referred to as marijuana and as defined in A.R.S. § 13 — 3401 (4)(b) in-eludes tetrahydrocannabinol ("THC"), its primary psychoactive component.

. Bufotenine, proscribed by A.R.S. § 13-3401(6)(a)(v), is a hallucinogenic drug generally ingested by licking the backs of cane toads. See Christen Conger, Are there really hallucinogenic frogs?, How Stuff Works (August 12, 2008), http:// www.science.howstuffworks.com/zoology/ reptiles-amphibians/hallucinogenic-frogl.htm

. The Dissent notes that under its plain language interpretation, § 28-1381(A)(3) might be constitutionally challenged as applied to a driver who had ingested a legal (or naturally occurring) substance that shares a metabolite with an illegal drug or who legally ingested marijuana. Dissent at ¶ 31. In support of this assertion the Dissent cites State v. Boyd, 201 Ariz. 27, 29-30 KIT 12-13, 31 P.3d 140, 142-43 (App.2001), which held § 28-1381(A)(3), as applied, void for vagueness, id. That § 28-1381(A)(3) is subject to more than one reasonable interpretation, one of which might render it unconstitutional, highlights its ambiguity. Furthermore, we "construe statutes, when possible, to avoid constitutional difficulties.” State v. Gomez, 212 Ariz. 55, 60 ¶ 28, 127 P.3d 873, 878 (2006) (citing Hayes v. Cont'l Ins. Co., 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994)).

. In light of our holding that "its metabolite” does not include Carboxy-THC, we do not address Shilgevorkyan’s various constitutional arguments.